**E. C. ERNST, INC., Plaintiff,**

v.

**MANHATTAN CONSTRUCTION COMPANY OF TEXAS et al., Defendants,**

v.

**MANHATTAN CONSTRUCTION COMPANY OF TEXAS, Plaintiff by Counterclaim,**

v.

**E. C. ERNST, INC., et al., Defendants by Counterclaim.**

**Civ. A. No. 6340–70–T.**

United States District Court, S. D. Alabama, S. D.

Dec. 11, 1974.

**1004**

---

Willis C. Darby, Jr., Mobile, Ala., for Providence Hospital.

Glower W. Jones, Smith, Currie & Hancock, Atlanta, Ga., Edward S. Sledge, III, Gallalee, Denniston & Edington, Mobile, Ala., Arthur Friedman, Tanner & Friedman, New York City, for E. C. Ernst, Inc.

David M. Thornton, Thornton & Stamper, Tulsa, Okl., for Manhattan Const. Co. of Texas.

Maurice Bishop, Bishop & Carlton, Clarence L. McDorman, Jr., London, Yancey, Clark & Allen, Birmingham, Ala., for Charles H. McCauley Associates, Inc.

Louis E. Braswell, Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for Fairbanks-Morse, Inc.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, District Judge.

HISTORY OF CASE

1. This proceeding should serve for years to come as a classic example of the economic futility of litigation of this nature and the need for settlement of such controversies.

2. In 1967, Providence Hospital of Mobile (Providence), a Catholic hospital operated by the Sisters of Charity, decided to substantially expand its facilities and to renovate and remodel its existing buildings. Providence obtained a Hill-Burton Federal Grant in the amount of $1,000,000.00. On October 27, 1967, Providence entered into a standard form architectural contract with Charles H. McCauley Associates, Inc. (McCauley), a large architectural firm in Alabama with wide experience in hospital construction. Pursuant to this contract, McCauley prepared plans, specifications and contract documents. On April 12, 1968, McCauley advertised the job for bids to be received until July 18, 1968. Seven contractors submitted bids. On July 29, 1968, the contract was let by Providence to Manhattan Construction Company of Texas (Manhattan) for a total contract price of $6,117,500.00. Manhattan entered into a subcontract with E. C. Ernst, Inc. (Ernst) under which Ernst agreed to furnish the materials and equipment and perform all of the electrical work for a cost of $982,215.00.[1] Under this subcontract, Ernst was required to provide emergency generators which it later contracted to purchase from Fairbanks-Morse, Inc. (Fairbanks-Morse), a fifth party to this litigation.

3. The contract between Manhattan and Providence incorporated the plans and specifications prepared by McCauley and provided that Manhattan was required to complete the project within 730 days. If the project was not completed within this specified period and any granted extensions of time, Manhattan agreed to pay liquidated damages of $250.00 per day until completion. The subcontract between Manhattan and Ernst provided the same time schedule and liquidated damages plus an indemni-

---

1. Ernst had also submitted bids to several of the general contractors bidding on the job, but submitted its lowest proposal to Manhattan.

fication agreement from Ernst to Manhattan.

4. The order to proceed was issued August 19, 1968. Therefore, the original completion date was August 18, 1970. During the period of construction, the time was extended by appropriate change orders for 185 days. Accordingly, the revised completion date was February 19, 1971. The job was accepted on May 17, 1972, making an overrun of 453 days.

5. This extended litigation was commenced on August 28, 1970, by Ernst filing a complaint against all other parties seeking a declaratory judgment and order "preventing the purchase and installation of any substitute equipment" in place of the Fairbanks-Morse emergency generator, with engines, which Ernst had proposed to install under its contract with Manhattan. The Court set the matter for hearing on January 27, 1971, on the sole issue of the sufficiency of the Fairbanks-Morse emergency generator system. Hearing on this issue was concluded on February 4, 1971, when this Court issued an order specifically finding that:

> "The emergency generator system (proposed to be furnished) does not meet the requirements of the specifications",

and that:

> "The Dorman engines proposed by Fairbanks-Morse to power the emergency generator system do not fulfill the horsepower requirements of the specifications.

> "The Court finds from the evidence that the material submitted to McCauley by Fairbanks-Morse, Ernst and Manhattan, or any one or more of them, failed to establish that the emergency generator system proposed to be supplied by Fairbanks-Morse, met the requirements of the specifications." [2]

6. This suit triggered a long pleading war with a series of amendments, cross-claims, counterclaims, and motions, bearing little resemblance to the original complaint and resulting in many issues between and among the parties.

7. On April 11, 1973, this matter was set down for pretrial, and the attorneys were instructed to have present at the pretrial, a representative of each litigant who had authority to negotiate settlement of this matter. Besides all attorneys being present, the litigants were represented as follows: Ernst, by a Vice President; Fairbanks-Morse, by a director; McCauley, by its liability carrier; Manhattan, by a Vice President; Providence, by its Administrator. At the commencement of the pretrial, the Court made the following statement:

> "Gentlemen, this is a case which should be settled between the parties. In present day thinking, it seems to be the idea that any problem can be cured in a Federal District Court. This, I assure you, is an erroneous approach. There is not a lawyer in this courtroom capable of operating the Providence Hospital. There is not a lawyer in this courtroom capable of running Manhattan Construction Company; there is not a lawyer in this room capable of running McCauley Associates; nor a lawyer in this room capable of running Fairbanks-Morse; nor a lawyer capable of running Ernst, and I assure you there is not a Judge in this courtroom capable of doing so. All of you litigants are successful operators or you would not be participating in a six million dollar contract. Lawyers in their zeal to represent their clients many times fail to see but one side of the litigation and that is the side of his client. This litigation is not a one-sided bit of litigation, it is a five-sided bit of litigation.

> I stated at the outset that this was a case that should be settled between the

2. The Court's Findings of Fact and Conclusions of Law on this generator feature are hereto attached and made a part hereof as Exhibit 1.

parties. I said that because this is a classic example where the cost of proper preparation of the case for trial is completely disproportionate to the benefits any of the parties could hope to derive. You'all are represented by capable attorneys. None of the attorneys want to go to trial in this case unless and until they have properly and thoroughly prepared their case for trial. This entails much pretrial discovery and pretrial discovery entails much lawyer time, much travel, much hotel expense. The point is, it is extremely expensive.

Not only does this continued litigation require discovery expenses, it entails expenses in the appellate court. This case is already no stranger to the Fifth Circuit nor the U. S. Supreme Court. Yes, litigation is expensive, but remember the courts do not create litigation, it is created by the litigants. I have asked that you representatives of the litigants be here today. Although I know you have been kept abreast of this litigation by your attorneys, I wanted you to hear directly from the trial judge his thoughts on this matter. You litigants are in a fairly closely related field. Being trained in this field, you are in a far better position to adjust your differences than those untrained in these related fields. As an illustration, I, who have had no training whatsoever in engineering, had to determine whether or not the emergency generator system proposed to be furnished by Fairbanks-Morse, met the specifications, when experts couldn't agree. That is a strange bit of logic.

If this case is not settled quickly, it is going to trial quickly, properly prepared or otherwise. To try this case will probably take not only days, but weeks, and I wish to state to all of you litigants and all attorneys here and now, if this case is not settled, it will be tried during the month of August, 1973, and it will take the precedence over vacations or any other business conflict.

The object of litigation is to do substantial justice between the parties litigant, but the parties litigant should realize that, in most situations, they are by their particular training better able to accomplish this among themselves.

This is your court, it is the peoples' court. It is properly staffed and ready, willing and able to try this case and will do so in August.

Regardless of the outcome, an appeal is almost certain. This will entail more expense and more delay.

Having thusly expressed myself, we will now proceed with the pretrial of this case. I will ask you representatives of the litigants to remain throughout this pretrial as your presence will most likely be helpful."

8. The case was not settled, and the trial was commenced on August 6, 1973. It entailed 40 days of court time, 41 witnesses (34 live and 7 by deposition) and 1056 exhibits. Presentation of the evidence was finally concluded on November 27, 1973. Thereafter, the litigants were given until the 28th day of January, 1974, within which to file Findings of Fact and Conclusions of Law. This time was extended to February 11, 1974. The Court after studying these Findings and Conclusions set the matter for final argument on May 22, 1974, each litigant being given one hour's time. The pretrial order entered in this case on the 26th day of April 1973, and amended on the 6th day of July 1973, is attached hereto and made a part of this Finding hereof as Exhibit 2. As stated above, portions of this case have already been before the Fifth Circuit and the Supreme Court. Docket numbers 72–3073 and 73–1287, Fifth Circuit and A–129, Supreme Court. Each contains a part of the history of this litigation.

9. PARTIES—The following parties are litigants in this action: Plaintiff, E. C. Ernst, Inc. (Ernst), is a corporation incorporated under the laws of the District of Columbia and has its principal place of business in the District of Columbia. Defendant Manhattan Construction Company of Texas (Manhattan) is a corporation incorporated under the laws of the State of Texas and has its

principal place of business in the State of Texas. Defendant Fairbanks-Morse, Inc. (Fairbanks-Morse) is a corporation incorporated under the laws of the State of Delaware and has its principal place of business in the State of Wisconsin. Defendant Providence Hospital (Providence) is a corporation incorporated under the laws of the State of Alabama. Defendant Charles H. McCauley Associates, Inc. (McCauley) is a corporation incorporated under the laws of the State of Alabama and has its principal place of business in the State of Alabama.

10. DESIGNATION OF BUILD-INGS—In the plans and specifications and in the testimony of witnesses, various portions of the construction project are referred to by separate building designations, although all of the work was inter-related and not separable into independent units. The project upon completion was a single integrated structure. The structure as it existed prior to commencement of the new construction or remodeling was referred to as the "existing building". The newly constructed six floor addition was referred to as "Building A" and consisted principally of patient rooms, operating suites, x-ray facilities and treatment rooms. A new single story addition with basement was added to the front of the existing building and was referred to as "Building B". It contained principally administrative spaces, entrance lobby, and records library (Tr. 2119).[3] The kitchen and cafeteria of the existing building were expanded by another one story addition referred to as "Building C". (PX 14A)

11. CLAIMS—The matter in controversy exceeds, exclusive of interests and costs, the sum of Ten Thousand Dollars ($10,000.00). The following claims are asserted by the different parties:

A. ERNST AGAINST MANHAT-TAN—Ernst seeks damages against Manhattan for delays and disruptions caused by Manhattan's breach of its obligations to do the following: To provide accurate plans, drawings and specifications for the project; to complete all preliminary work necessary in order to allow Ernst to perform its work; to coordinate the work of and among the various subcontractors; to make or obtain prompt decisions on all questions requiring an answer from the owner, architect or general contractor; to supply promptly information required from the owner, architect or general contractor; to act promptly and dispositively, or to procure others to so act, upon all requests for approval of material and equipment; to make available to Ernst in timely fashion the specific areas necessary for the performance of each part of Ernst's work; to coordinate the work performed by Manhattan and other subcontractors so as to prevent any interference with the timely performance of Ernst's work; to promptly make, issue or procure understandable and feasible clarifications of specifications, drawings or plans, and to issue promptly any directions necessitated thereby; and to do all things necessary to be done in order to complete, or to permit the completion of, the project within the time frame specified therefor. In addition to the above, Ernst claims a balance of $6,-252.60 due from Manhattan under the contract. Finally, Ernst asserts that a novation was agreed to among Manhattan and Tube-O-Matic, Inc., one of Manhattan's subcontractors, whereby Manhattan was directed in writing to pay Ernst a sum of money on account of work done by Ernst in fulfillment of Tube-O-Matic's obligations on the project.

B. ERNST AGAINST FAIR-BANKS-MORSE—Ernst claims damages against Fairbanks-Morse for breach of its obligations under their contract for the procurement of an acceptable emergency generator system. Manhattan has

3. The following abbreviations are used throughout this opinion: Tr., Transcript of Trial; EX, Ernst Exhibit; PX, Providence Exhibit; McX, McCauley Exhibit; MX, Manhattan Exhibit and FX, Fairbanks-Morse Exhibit.

withheld from Ernst funds due it totalling $143,293.65 on account of claimed costs to Manhattan in furnishing, in lieu of the Fairbanks-Morse system, an emergency generator system which complied with the plans and specifications. Ernst therefore claims damages in an amount, plus interest, equal to all or any portion of such back charges which are sustained as proper by this court and which are in excess of $83,740.00, such latter sum being the contract price to Ernst for the Fairbanks-Morse system. If all back charges are sustained, then the damages sought by Ernst hereunder would be $59,553.65 plus interest. Ernst also seeks general damages for any losses it has sustained which are attributable to delays or disruptions caused by Fairbanks-Morse's attempt to supply and have accepted its non-complying emergency generator system. In addition, Ernst claims that Fairbanks-Morse is obligated pursuant to their contract to indemnify Ernst against any losses for which Ernst is held liable and which resulted from Fairbanks-Morse's failure to furnish timely a complying emergency generator, said indemnification to include all of Ernst's legal fees and expenses in this action. Finally, Ernst claims punitive and compensatory damages against Fairbanks-Morse for wilfully and knowingly making fraudulent misrepresentations to Ernst relating to its generator's compliance with all specifications of the Contract Document and Ernst's own purchase order, Ernst having relied upon such misrepresentations. Ernst asserts that such misrepresentations regarded, among other matters, horsepower ratings and merchantability, the latter despite the used, failed, rebuilt and cannibalized condition of the generators supplied by Fairbanks-Morse.

C. ERNST AGAINST PROVIDENCE—As a third-party beneficiary of the contract between Providence and Manhattan, Ernst claims damages against Providence for delays and costs of court caused by Providence's breach of its contract to do the following: to supply plans, drawings and specifica-tions for the project which correctly and completely depicted the work to be performed and which were feasible for the accomplishment of the work; to promptly supply such information as was required from it in the course of the performance of the work; to promptly issue such clarifications as were required from it in the course of the performance of the work; to act promptly upon necessary approvals of material or equipment to be used in the course of performance of the work; and to promptly do all things required in order to enable all persons, including Ernst, timely and in an orderly manner to perform their obligations under their contracts and subcontracts within the time frame specified therein.

D. ERNST AGAINST McCAULEY—As a contractee with McCauley in connection with the procurement of the plans and specifications, Ernst claims damages against McCauley for breach of its warranty that the plans and specifications were in all respects accurate, complete and sufficient so as to allow proper evaluation of work to be done under the contract. Ernst asserts that McCauley's breach of its warranty caused delays and disruptions in the supply of equipment and materials and ultimately in the completion of the project. As third-party beneficiary of the contract between Providence and McCauley, Ernst claims damages against McCauley for failure to provide plans and specifications suitable for determining the scope and cost of work to be performed and for feasible construction; for failure to timely effect necessary clarifications, corrections and changes in the plans and specifications; and for failure to promptly act upon submittals of data, samples and the like which were required to be submitted to the architect.

E. MANHATTAN AGAINST PROVIDENCE—Manhattan initially claimed that a balance of $334,473.79 was due it under its contract with Providence. On July 27, 1973, the Court ordered Providence to make a payment of

$211,475.00, thus reducing the balance due to $123,000.00. In addition, Manhattan claims damages against Providence for intentional interference with Manhattan's timely performance of the contract by failing to deliver portions of the "existing building" for renovation and by employing incompetent agents and representatives. Manhattan claims further damages for improper processing of submittals, improper handling of the patient bed light fixtures selection and installation, and improper handling of the emergency generator selection and installation.

F. MANHATTAN AGAINST Mc-CAULEY—Manhattan seeks damages against McCauley for failure to perform general contractual duties, for failure to properly process submittals, for failure to handle properly the bed light fixtures selection and installation and for failure to handle properly the emergency generator selection and installation.

G. MANHATTAN AGAINST ERNST—Manhattan seeks indemnification from Ernst as to any liquidated damages for which Manhattan is deemed liable to Providence and for recoveries against Manhattan by any cross-claimant or plaintiff. Manhattan also seeks damages based on contract and fraud theories relating to the furnishing of the patient bed light fixtures, the explosion-proof receptacles, the wiring and the emergency generator. Manhattan alleges that Ernst and Fairbanks-Morse, jointly and independently beginning in October 1968, represented to Manhattan that the Fairbanks-Morse generator system met the required specifications, that said representations were made knowing them to be false and that Manhattan relied on the misrepresentations to its detriment. Manhattan alleges a conspiracy to defraud it by Ernst and Fairbanks-Morse and seeks punitive damages against Ernst for its fraud.

H. MANHATTAN AGAINST FAIRBANKS-MORSE — Manhattan seeks damages against Fairbanks-Morse based on contract and fraud theories re-lating to the furnishing of the emergency generator. Manhattan also seeks punitive damages against Fairbanks-Morse.

■ I. CLAIMS BY PROVIDENCE—Providence has no formal claim for liquidated damages. However, this issue was framed by the Court in its pretrial order. Rule 15(b) provides that, "[w]hen issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Providence has also pleaded over against McCauley for indemnification as to any liability Providence might have on the various claims asserted by Manhattan against Providence.

12. McCauley and Fairbanks-Morse make no claims against any of the other litigants. Their sole position being defensive.

13. The pleadings as framed are more the product of fertile legal minds that they are definitive of the real issues involved in the law suit. Every conceivable issue was raised even though many would have no effect on the outcome of the case. The real issues are:

a. What was the actual number of days of overrun for which liquidated damages are to be assessed, and who was responsible therefor?

b. Did the question of whether or not to use a sewage ejector pump or a gravity system cause any delay in the completion of the entire contract?

c. Did the installation of the explosive proof receptacles in the new operating rooms cause any delay in the ultimate completion of the job?

d. Did the decision as to what patient room light fixtures would be used cause any delay in the ultimate completion of the job?

e. Did the problems in selection and installation of the emergency generator system cause any delay in ultimate completion of the job?

f. Did Ernst's activities during the selection and installation of the emergency generator constitute fraud?

g. Was Fairbanks-Morse guilty of fraud in regards to the emergency generator system?

h. Did the method in which the hospital released space in the old building to Manhattan cause any delay in the ultimate completion of the job?

i. Did Manhattan fail in its duty to supervise and coordinate the work, and, if so, did it delay the ultimate completion of the job?

j. Is Providence entitled to a judgment over against McCauley?

### FINDINGS OF FACT

*The Issue of Liquidated Damages*

14. The claim of Providence, raised *sua sponte* by the Court, for liquidated damages under its construction contract creates several factual issues, primary of which is the period of time for which these damages should be applied. This question is resolved by determining the number of days for which extensions were granted or should have been granted beyond the scheduled completion date of August 18, 1970. The number of days for which extensions were approved, or should have been approved, should be subtracted from the 638 days between August 18, 1970, and May 17, 1972, when the project was conditionally accepted. Another question relates to the extent, if any, that Providence may have been responsible for delays which caused the project to extend beyond its scheduled completion date.

15. There was a dispute with respect to a request by Manhattan for an extension of time for 39 days. Manhattan contended that it experienced that much delay in obtaining access to the old operating room area, which had necessarily been kept in operation until occupancy of the new operating area. (EX–492, 493) By letter of April 27, 1972, McCauley had recommended approval of the request to Providence. (EX–493) On April 28, 1973, Providence first denied the request (EX–494), but then, by letter of May 10, 1972, it advised that it would grant the extension of 39 calendar days. (EX–495) On May 18, 1972, Providence changed its position and directed McCauley to disregard its approval letter of May 10, 1972, and to deny the requested extension (EX–494) The Court finds that the extension requested should have been, and was, approved by Providence and therefore allows it in the computation herein.

16. Additional extensions of time were requested and denied. These requests were properly denied and will be considered in connection with the discussion of the portion of the work to which they were related. The extensions properly granted and due to be deducted from the 638 total days overrun comprise 185 days which total includes the disputed 39 days discussed above and extensions granted in connection with Change Orders 1–12, inclusive. There should also be deducted 65 days for which Providence was responsible in regard to the sewage ejector pump and 29½ days in regard to the bed light fixtures, as are hereinafter discussed. In addition, for the purpose of computing liquidated damages, there must be deducted from the total overrun the delays caused by McCauley, it being Providence's agent, which were 29½ days in regard to the bed light fixtures and 80½ days in regard to the emergency generator, also hereinafter discussed. Accordingly, the overrun for which liquidated damages are due is 248½ days for a total of $62,125.00 in damages, the contract providing for liquidated damages of $250.00 per day.

17. The more difficult determination confronting this Court is how the blame for this overrun should be assessed among the parties and what effect this will have on the right of Providence to recover the liquidated damages sought. From the foundation to the finish work there were multiple difficulties, many of which should have been anticipated in a job of this magnitude involving new con-

struction and the remodeling of hospital facilities where sick patients had to be treated, operations performed, and hospital functions continued without interruption.

18. In summary form, to be further detailed in connection with the more specific issues to follow, the progress was substantially as follows: In 1968 and early 1969, foundations for the additions to the existing hospital (Buildings A and B) were being laid. Inclement weather and the necessity for some unexpected work on the pilings on which the foundation would rest (for which all extensions requested were granted) put the project behind schedule. Manhattan prepared a bar chart showing anticipated commencement and completion dates for cataloged portions of the job, but admittedly abandoned the chart during the early parts of the project. There is testimony that there was a period of progress during the time that Building A was being raised to its full six stories, but there were difficulties regarding certain materials and equipment to be installed, specifically the emergency generator system, bed light fixtures, and deficiencies discovered in the explosion-proof receptacles. Delays involving these items will be discussed in more detail. In 1970 work continued on the new building. Building B was completed in November 1970, and the renovation work begun in the non-patient areas of the existing building. By Janury 1971, Building A had reached a point in its construction where it could have promptly been made ready for patient occupancy if the emergency generators had been available. Apparently, Manhattan and its subcontractors did not push to complete the building during the winter of 1970–1971. After the emergency generator arrived and was installed, Building A was occupied by patients from the existing building, and portions of the existing building were turned over from time to time, by Providence to Manhattan for renovation.

19. On May 3, 1971, it was discovered that the explosion-proof receptacles (FX–115, p. 328) which were required in the new operating rooms in Building A had been defectively and dangerously installed, thereby delaying occupancy until the defects could be corrected. This meant that Providence had to continue to use the operating rooms in the existing building which to some extent disrupted Manhattan's renovation of the existing building. There were further problems with the emergency generator, but the work continued through May 1972, in connection with renovations in the existing building.

20. The various witnesses at the trial attempted to allocate periods of delay which prolonged the ultimate completion of the project. However, the Court finds it impossible to affix periods of delay with any degree of accuracy, except with respect to the emergency generator, the explosion-proof receptacles and the bedlight fixtures. There is some evidence that Providence delayed completion of the project through a lack of coordination in turning over parts of the existing building to Manhattan. There is other evidence that Providence was conscientious in providing access to the existing building but necessarily was at times delayed in view of the recognized commitment to keep the hospital operational. It is apparent that Manhattan and Ernst underestimated the difficulties inherent in this renovation under the contract conditions.

21. Representatives of the various parties attempted to assess the responsibility for delay on others than themselves. Every witness testified that there was some overlap with respect to the delays experienced and the cause therefor. They further testified that the delays were due to various causes, as to a portion of which some defendants admittedly could not be held responsible.

*Sewage Ejection Pump*

22. The plans and specifications for the project provided for the sewage outflow line serving the hospital to be placed underground beneath the

floor of the Building B addition. An electric sewage ejection pump was to be installed for the purpose of lifting or pumping the sewage up to the level at which it could be discharged into the municipal sewer lines. By November 1968, Manhattan had completed the excavation for the basement of Building B (an area approximately two hundred feet by fifty feet by ten feet deep) and the reinforcing steel for the pilings and had in place the pile caps, the walls and the underground piping. Manhattan was now ready to pour the basement floor. At this time, McCauley directed that the pouring be held up. The building engineer for Providence had belatedly realized that, by running the sewage line through the basement rather than under the floor, the sewage could be made to flow out of the hospital by gravity and that the need for the ejection pump could be eliminated along with its resulting cost and operating and maintenance expense. (PX 3, Tr. 2116–2123)

23. On November 14, 1968, Manhattan was requested by McCauley to propose a change in the contract price for eliminating the pump and changing the sewage line to a gravity flow system. Had the gravity flow arrangement been originally designed by McCauley, it would have been less expensive than the underground pipe and pump system. However, the work had progressed so far at the time the change was proposed that it would then have cost more to change the design to a gravity-flow line than it would have cost to proceed with installation of the pump. Manhattan and its plumbing subcontractor submitted to McCauley a proposal for the change on December 11, 1968. That proposal was disapproved for the reason that it did not coincide with an estimate made by one of McCauley's consulting engineers. The proposal was resubmitted on February 21, 1969. Manhattan was notified on March 25, 1969, that the proposal was rejected. Manhattan was then permitted to resume its work and

to install the pump as originally designed. (MX 244, Tr. 2116–2123)

24. Installation of the sewage ejection pump system was stopped on November 14, 1968, and resumed again on March 25, 1969. Thus, there was a delay of some 131 days in the installation of the sewage system. Manhattan requested an extension on its contract of 131 days because of this delay, but its request was denied by the architect. At trial, Manhattan insisted that it was entitled to this extension. Fairbanks-Morse joined Manhattan in this position. Ernst also insisted at trial that it was entitled to an extension of 131 days with the delay being attributed to Providence and McCauley. Both McCauley and Providence argued that the extension was properly denied.

25. It is true that there was a delay of 131 days in the installation of the sewage system and that this particular delay resulted from the failure of Providence and McCauley to decide promptly which sewage system would be used. However, the Court does not find that this delay caused a corresponding delay of 131 days in the completion of the project as a whole. According to his testimony (EX 244), Manhattan's own Vice President, Mr. Roberts, originally had felt that this 131 days could have been absorbed within the contract's time limit for the job. Although Mr. Roberts later changed his mind, the Court shares his original thoughts to the extent that with proper supervision and coordination by Manhattan and McCauley, this entire time could have been absorbed. However, the fact is that it was not absorbed. Providence is the one who originally came up with the idea of the gravity system, and this caused the stoppage of this phase of the work. While it is impossible to determine to a certainty the number of days delay which this problem caused in the ultimate completion of the job, suffice it to say that such delay, as there was, was caused by Providence. The Court feels therefore that one-half of this 131 days is as accu-

rate an estimate as can be made of the actual resulting delay, that 65 days of delay should be charged against Providence and that Providence should not be paid liquidated damages for that period.

### Explosion-Proof Receptacles

■ 26. The specifications provided, in part:

"*Receptacles*:

"Explosion-proof receptacles in operating rooms and hazardous area shall be flush mounted, 125 volt, 20 amps, 3 pole (grounding) with armored cord grip plug for each receptacle, polished chrome finish, Hubbell No. 24309 and No. 24312 cap." (PX 3, pg. 18–26; Tr. 499)

"*Type of Installation*:

"(c) All work installed in Operating, Delivery and Emergency Rooms and areas containing combustible anesthetics shall be in accordance with requirements of the National Electric Code for Class I Group C installation of all equipment within five feet of the floor. Other equipment in areas shall comply with N.F.D.A. No. 56." (PX 3, p. 18–6; Tr. 499)

"*Standards of Materials and Workmanship*:

"All materials shall be new and shall be listed as approved by the Underwriters' Laboratories, Inc., in every case where a standard has been established for the particular type of material in question. All work shall be executed in a workmanlike manner and shall present a neat and mechanical appearance when completed." (PX 3, pg. 18–3)

27. An explosive-proof receptacle, of the type involved in this litigation, is a device consisting of three principal parts. The largest part is a heavy cast-steel, cube-shaped box fitted with screw-out plugs for attachment to electrical conduits at various points. The box is hollow, and one side has a threaded opening three inches in diameter. Into this threaded opening is screwed a cast-steel collar, the threaded portion of which is approximately $1\frac{1}{8}$ inches long. On the outer end of the collar is a flange plate $4\frac{1}{8}$ inches in diameter and $\frac{1}{4}$ inch thick. The outer face is machined perfectly flat, and it has four threaded holes for the attachment of the third part. The third part of the device has a heavy cast-steel face plate, the outer face of which is chrome plated and the inner face is machined so as to seal against the face of the flange on the collar. On the inner side of the face plate is a sealed can-type unit containing the electrical contact portion of the receptacle. When assembled, four screws pass through holes in the face plate and into the holes in the collar flange, making an airtight seal between the machined faces of each. The face plate contains the female portion of the receptacle, into which a specially-designed male plug may be inserted. (EX 706; EX 511)

28. The codes referred to in the specifications quoted above require the use of explosion-proof receptacles for all installations in operating rooms and similar areas below the level of five feet above the floor in order to eliminate the risks of explosion and fire. Gases used for anesthesia are highly flammable and explosive. Operating rooms where these gases are used are kept under positive air pressure to minimize the possibility of entry of contaminants. Ventilating air is introduced at points high in the room and exhausted near the floor, so that any explosive gas leaking in the room would be drawn downward and exhausted. The area below five feet above the floor is considered hazardous because any explosive gas which escaped would be drawn downward. The explosive-proof receptacle is so designed and constructed so that when properly installed, if any explosive gas is forced into the wall cavity and into the receptacle by the pressure in the operating room and there ignited by a spark from the receptacle, the force of a resulting explosion would be contained within the

device. Fire or hot gases would therefore not be permitted to escape and cause a larger explosion inside the operating room. (Tr. 500–2)

29. For a proper and safe installation in a wall, the cited codes require that at least five full turns, or threads, of the collar must be engaged in the threads of the box and that the machined faces of the collar flange and the face plate must be tightly drawn together with not more than .00015 inch clearance between them. If either of these requirements is not complied with, fire and hot gases could escape from the device in the event of an explosion inside of it. (Tr. 501)

30. As the walls in which the explosion-proof receptacles were to be installed were constructed, it was the responsibility of the electricians employed by Ernst to insure that the electrical conduit and the box portion of the device were properly positioned. This was necessary so that the face plate portion could be installed flush with the outer surface of the wall while obtaining the necessary engagement of the collar at least five full threads into the box and the seal between the face plate and the collar flange. (Tr. 910, 913, 3442) When the electricians installed the face plates, they knew whether or nor they had the proper seal and thread engagement. (Tr. 893, 913, 971)

31. On May 3, 1971, Mr. Lacefield, McCauley's electrical consultant for this project, made an inspection of the electrical work at the project, including the operating rooms in Building A. (Tr. 506–7) At that time, the explosion-proof receptacles had been installed by Ernst. To all outward appearances, the receptacles had been properly installed. The face plates were in place against the walls. (Tr. 510) However, the receptacles had actually been improperly installed by Ernst. On many of the devices, the collars were not engaged five threads into the boxes, and the machined faces of the collar flanges were not in contact with the machined faces of the face plates. (Tr. 510, 894, 974, 978) It

was necessary to remove the face plates in order to discover the improper installations and the hazardous condition thereby created. (Tr. 510, 974)

32. The Ernst electricians, who knew that they had installed the receptacles in an improper manner and thereby created the potential for a disastrous explosion in an operating room, had nevertheless concealed the hazard by procuring screws longer than those provided for attachment of the face plates to the collar flanges. These long screws were extended through the holes in the face plates, making it possible to secure the face plates to the wall without the machined surfaces of the face plates and the collars being in contact. (Tr. 1801–4, 1810, 1817) Mr. Johnson, a Vice President of Ernst, admitted that Ernst's installation and concealment of the defects had been improper. (Tr. 974, 978)

33. After discovery of the condition created by Ernst, it was necessary to find some method of correcting the defects and providing a safe installation. It was decided that this could best be done by obtaining collars having a longer threaded portion, which could be screwed five or more turns into the boxes and still meet the face plates with an airtight seal. These had to be ordered from the manufacturer and specially fabricated. This process and required testing by the Underwriters' Laboratories, Inc. required over three months. (Tr. 944–5, 948) Ernst acknowledged its responsibility for the installation of the receptacles by ordering and paying for the special long collars without asking for repayment by Manhattan or any other party. (Tr. 947–8, 956–7; EX 709)

34. By October 6, 1971, the longer collars had been delivered and installed. On that date, Mr. Lacefield made an inspection of the operating rooms and found most of the explosion-proof receptacles to be acceptably installed. Three or them were still not proper, however, and one had been pounded on the face plate in an effort to drive it into the

wall far enough to fit. (Tr. 508–9; McX 84, pgs. 174–5) These installations were subsequently corrected. (Tr. 512)

35. With the exception of the explosion-proof receptacles, the operating rooms in Building A were complete and ready for use on July 1, 1971, when the remainder of the building was accepted and occupied. (Tr. 269, 2288) The operating rooms could not be used until proper and approved installation of the receptacles had been made. Providence was finally able to move into the new rooms on October 15 and 16, 1971. The first surgeries were performed in Building A on October 17 or 18, 1971. (Tr. 257, 270)

36. Since use of the operating rooms in the existing building had to be continued until the operating rooms in Building A could be used, the scheduled renovation of the areas of the existing building occupied by the surgical rooms, recovery rooms, labor and delivery rooms and the nursery were delayed as the direct result of Ernst's improper installation and concealment of the explosion-proof receptacles. This delay was for a period of 108 days, i. e. July 1 to October 16, 1971. (Tr. 269–73, 2152–5, 2288–90, 2311, 2670, 4423, 2601)

37. Ernst contended that the improper installation of the explosion-proof receptacles was caused by Manhattan's failure to build the walls in accordance with the plans and specifications. No convincing evidence of defective construction was presented. In any event, the matter became a problem and caused delay in the completion of the project only because Ernst's employees knowingly installed the receptacles in an unacceptable manner and concealed their wrongdoing with the long screws. The responsibility for the delay is solely that of Ernst, and it contributed 108 days to the total overrun on the project as a whole.

### Bed Light Fixtures

38. The plans and specifications for the project required that each of the patient bedrooms in Building A would have installed in them a wall-mounted lighting fixture. The fixture consisted of a fluorescent lighting feature and a console which contained outlet connections for oxygen, nitrogen, vacuum, telephone and electricity. An integral part of the fixture was a back box, which was recessed and mounted into the wall at the time the wall was constructed. The required connections to electrical conduits and plumbing piping were made into the back box, which was concealed by a front, or exterior portion of the fixture when installation was completed.

39. The bedlight fixtures were required to have two lamps, or bulbs, one of which would shine primarily downward, providing a reading light for the patient, as well as some indirect illumination of the room. The other lamp would shine primarily upward for indirect room illumination. This lamp would be controllable by a switch convenient to the patient and by a switch near the entrance to the room. In order to have this two-point switching capability, it was required that the fixture contain two lamp ballasts. (Tr. 462) It was also required that the fixture be of brushed aluminum with an anodized finish and that it have rounded edges. (Tr. 463)

40. The patient rooms in the existing building were equipped with fixtures manufactured by the Sunbeam Lighting Fixture Company and designated as "Centron 10". In the planning stages of the project, the employees of Providence had decided that they desired that the patient rooms in the new addition be furnished with fixtures designated as "Centron 5", a fixture also manufactured by Sunbeam, but having all of the desired features. The specifications for the project were written to describe the Centron 5 fixtures which Providence wanted installed. (Tr. 477, 479, 816, 519) The lighting fixture schedule said that they were to be Centron 5 fixtures (further described by the catalog numbers from the Sunbeam catalog) or an

"approved equal". (PX 3, pg. E–30, Tr. 453) At the time he prepared the specifications, Mr. Lacefield, the consulting electrical engineer employed by McCauley, was not aware of any fixture manufacturer, other than Sunbeam, who produced a fixture which would comply with the requirements of the specifications. (Tr. 529–30, 532) He had determined that the Centron 5 would comply. (Tr. 525–6)

41. This project being partially financed by a Hill-Burton Grant required that the funding of the monies be supervised by the Bureau of Health Facilities Construction of the Alabama State Health Department. (Tr. 611)

42. Regulations of the Department of Health, Education and Welfare (HEW) and the State Health Department applicable to projects receiving Federal funding under the Hill-Burton Act required very strictly that free and competitive bidding be permitted and encouraged for all work and materials being supplied. These regulations were distributed to all architects and others involved in hospital construction matters. (Tr. 612, 616) [4] Each section of the specifications contained the required wording, set out in footnote 1, in the form of a paragraph of very small print in the upper right corner of the first page. It appeared at the beginning of Section 18 covering the electrical work. (PX 3, pg. 18–1)

43. The plans and specifications and the instructions to bidders on the project, which were distributed to prospective bidders in June, 1968, contained a requirement that any bidder who proposed to use an article different from the one designated by name in the specifications was required to obtain the architect's approval for such substitution

not less than ten days prior to the bid date. The State Health Department deemed this provision to contravene the requirements for competitive bidding and directed that it be withdrawn. This was done by McCauley by an addendum issued shortly before the bid date. (Tr. 618)

44. The architect's specifications, to the extent that they named only one manufacturer and one model—Sunbeam Centron-5—made by that manufacturer, were in violation of HEW and Hill-Burton regulations for a project of this kind.

45. Ernst, whose responsibility it was under the electrical subcontract to supply all of the light fixtures, including the patient bed lights, had estimated in preparing its bid to Manhattan that the fixtures would cost $141,910.00 and that, because of its buying practice, it could reduce that cost by $35,377.00 in actually making the purchase. (Tr. 844) Ernst entered into a purchase order contract with Moore-Handley, Inc., a supplier, to furnish the required fixtures. The purchase order did not designate manufacturers or models but merely incorporated the requirements of the plans and specifications. It put the burden on Moore-Handley to furnish the fixtures which would comply with the requirements and satisfy McCauley and Providence. (MX 171; EX 699; Tr. 846–7) Moore-Handley proposed to furnish bed light fixtures called "Versalux" manufactured by Pacific Associated Company (Palco) as equal to the Centron-5. Moore-Handley prepared material concerning all of the light fixtures for submission to McCauley for approval. The submittal included shop drawings showing details of the proposed fixtures. In accordance with the contractual relation-

4. These regulations require, *inter alia*: "The following paragraph shall appear at the beginning of each division or section of the specifications: Notwithstanding any reference in the specifications to any article, device or product, material fixture, form or type of construction by name, make or catalog number, such references shall be interpreted as establishing a standard of quality and shall not be construed as limiting competition; and the contractor in such cases may, at his option use any article, device, product, material, fixture, form or type of construction which in the judgment of the architect, expressed in writing, is equal to that specified." (EX 5, pg. 6, Tr. 612–3)

ships, Moore-Handley forwarded the material to Ernst, who forwarded it to Manhattan, who forwarded it to McCauley, who submitted it to Lacefield.

46. By letter of October 4, 1968, McCauley asked that samples be furnished of all light fixtures that Ernest proposed to furnish, so it could be determined that Providence would get what it wanted. This request was forwarded to Ernst, to Moore-Handley and to Associated Manufacturers Agents, the representative of the fixture manufacturer. (PX 16; Tr. 747–8)

47. There was a substantial interval of time between the initial submission of Palco for approval and the ultimate acceptance of Palco for installation on the job. In this interval, which ran from approximately January 1969 through April 1970, submissions were made to the architect and returned as rejected for "reasons noted", but with no reasons noted. Although no sample was submitted with the first submissions on January 19, 1969, when a sample was submitted at McCauley's offices in Birmingham in October 1969, McCauley refused to look at it. At this point in time, because of the desire of Providence or McCauley that Sunbeam Manufacturers fixtures only be supplied, it was concluded that this equipment would be removed from the existing contract and Sunbeam fixtures procured independently by Providence. Subsequently, after further delay and in the intercession of the Alabama State Department of Health, Palco fixtures, which were at all times the functional equivalent of the Sunbeam and of equal quality, were designated and approved for installation and were actually installed.

48. Providence and McCauley should have accepted and approved the Palco fixtures in January 1969, when the first submittal was made, rather than 14 months later in March 1970, since it was unquestionably "equal" to the specified Sunbeam Centron-5 unit. The failure to do so was the result of Providence's decision in advance of the submission of bids on the project that it wanted nothing but the Centron-5 fixtures installed, as discussed above. Conclusive evidence of this decision and of the lack of good faith on the part of Providence and McCauley in their repeated disapproval of the Palco Fixtures is found in several facts. Prior to the bidding on the project, a request for approval of the Palco fixtures was made to McCauley pursuant to the requirements for pre-bid approval of alternate products, which requirement was subsequently deleted from the specifications. See Finding 43, supra. McCauley and Providence made no response to that request for approval and did not inform the prospective supplier that a decision had been made to accept only Centron-5 fixtures. (Tr. 577) Subsequently, McCauley refused even to look at a sample of the Palco fixture delivered to its offices. (Tr. 775) Each of the submittals on the Palco fixtures was marked "disapproved for reasons noted", but no reasons were given. (Tr. 744, McX 88, pg. 22; McX 73, pg. 152; Tr. 745; McX 88, pg. 42; Tr. 484) During the time that Providence and McCauley were engaging in the unwarranted and unexplained objections to the Palco fixtures, McCauley approved the purchase and use of plumbing connections for the back boxes of the patient bed light fixtures which would only fit the Centron-5 units, and not the Palco fixtures. (EX 782; Tr. 1998–9; Tr. 1985–92) During the same period, McCauley was stating that Providence intended to procure the fixtures itself.

49. Providence's and McCauley's handling of the selection of the bed light fixtures caused a delay in the completion of the overall project. Due to that delay, Manhattan requested a 59 day extension of the completion date. Providence refused the extension. The Court, however, finds that the requested extension was justified and mandated by the acts of Providence and McCauley. Therefore, for purposes of calculating liquidated damages due Providence, this 59 day extension is treated as if it had been granted. In addition, the Court finds that McCauley's mishandling of

the selection caused 50% of this delay and that, therefore, McCauley was responsible for 29½ days delay in the project as a whole.

*The Emergency Generators*

A. IN GENERAL

50. The plans and specifications for the project required the furnishing of an emergency generator system, including two diesel-driven generators, to provide a standby source of electrical power for the hospital in the event of a failure of the regular supply from the utility company. The specifications for the system were extremely detailed and lengthy. All of the general specifications and the regulations under the Hill-Burton Act were also applicable to the emergency generator system, as were State Health Board Regulations.

51. Certain pertinent requirements of the specfications regarding the emergency generator system were: (a) All components must be of American manufacturer. (b) All components must be standard products of a manufacturer of the generator units for at least two years. (c) The units must be of proven reliability. (d) The generator must produce 600W in continuous operation and have a ten percent overload capacity for two hours. (e) The engines powering the generators must produce a minimum of 950 horsepower at 1800 RPM under specifically stated conditions of operation with all auxiliary equipment attached and working. (f) All components must be new and of best quality.

52. It was the obligation of Ernst under its subcontract with Manhattan to furnish and install the emergency generator system in compliance with the plans and specifications for the project. (EX 12) As noted above, on February 4, 1971, following a prior hearing in this action, the Court made and entered Findings of Fact adjudging that the emergency generator system which Ernst and Fairbanks-Morse proposed to furnish and install in the project did not comply with the requirements of the specifications. See Exhibit 1 hereto attached. Those findings are supported and reinforced by the evidence adduced at this trial.

53. Prior to the submission to Manhattan of its bid for the electrical work in the project, Ernst solicited price quotations on emergency generator systems from many suppliers. (MX 31) Among those submitted was Fairbanks-Morse's which quoted a price of $83,740.00 for its system including two Fairbanks model 600 TCW 12 generators which units were the ones ultimately proposed by Ernst for installation. (MX 33; Tr. 1008)

54. On June 25, 1968, Fairbanks-Morse wrote to McCauley requesting approval of Model 600 TCW 12 units for use in the project. Enclosed with that letter was a Fairbanks-Morse brochure of technical data on the units showing, *inter alia*, brake horsepower of 935 at 1800 RPM. (MX 33) The specifications required "not less than 950 at 1800 RPM." By memorandum of June 26, 1968, Lacefield noted, "O.K. provided they meet requirements of plans & specs". (MX 33) By letter on July 5, 1968, McCauley told Fairbanks-Morse that the units were approved provided the requirements of the plans and specifications were met. (MX 36)

55. During August of 1969, at the time construction was just commencing on the project, an employee of the Caterpillar distributor in Mobile, wrote Lacefield telling him that the generators units proposed by Fairbanks-Morse were powered by imported Dorman engines and did not comply with the specifications. (Tr. 2879–2884; Tr. 2965–9)

56. On August 27, 1968, Ernst entered into a purchase order contract with Fairbanks-Morse to supply the two engine generator units and all other components of the system for a total delivered price of $83,740.00. This contract did not designate any make, model or manufacturer of the generator units, but rather, merely recited the requirements for the various components from

the specifications. Ernst, by drafting of its purchase order, put the burden on its supplier to provide equipment which would be approved as satisfying the requirements of the specifications. (Tr. 1105)

57. On October 18, 1969, the first submittal of information and material seeking approval of the proposed emergency generator system was made by Fairbanks-Morse, through Ernst and Manhattan, to McCauley and referred to and reviewed by Lacefield. By letter, Lacefield sent to McCauley a list of comments and omissions concerning the submittal. He held the submittal pending receipt of additional material. No question was raised or mention made that the diesel engines were imported from England or that they were not standard products of Fairbanks-Morse. (MX 42) Additional material and information seeking approval of the generator system was forwarded by Fairbanks-Morse and Ernst on December 16, 1968, and January 3, 1969. (MX 43, 45, 46, 426, 427) All of the submittals were disapproved by McCauley on January 8, 1969, based upon a letter from Lacefield dated January 7, 1969, which noted 17 points of noncompliance. However, again there is no mention of the origin of the diesel engines. Lacefield's letter was transmitted to Manhattan and Ernst. (MX 45) Ernst severely criticized Fairbanks-Morse for the poor quality of the submittal material and demanded prompt action to obtain approval of the generators. (MX 428)

58. In addition to the correspondence and formal submittals of information by Fairbanks-Morse and Ernst in their efforts to obtain McCauley's approval of the proposed Fairbanks-Morse generator units, conversations and meetings took place. On February 4, 1969, Lacefield met in McCauley's offices with representatives of Fairbanks-Morse and Ernst to discuss the emergency generators. It was agreed that, in addition to all required material and information, Fairbanks-Morse would submit a list of existing installations of the units

and complete data covering the diesel engines. (MX 47) On February 13, 1969, Fairbanks-Morse again met with Lacefield in Birmingham for discussion of the generators. The following day, Lacefield advised McCauley that he did not consider the Fairbanks-Morse units acceptable because, "The engine which is proposed for use on the sets is not manufactured by Fairbanks-Morse, but is made by the Dorman Company in England." For the first time, more than four months after receipt of the first submittal, Lacefield rejected the generators on the basis of information which he had had for over six months. (See 55 above) Ernst informed Fairbanks-Morse on March 20, 1969, that McCauley was rejecting the units based on the foreign manufacture of the engines. Ernst furnished Fairbanks-Morse a copy of the "General Conditions" section of the specifications, as requested, and again demanded immediate action to resolve the generator matter. (MX 429)

59. Following a telephone conversation between Manhattan and McCauley on March 13, 1969, McCauley wrote to Manhattan that the submittal generators were not considered acceptable. It said, "It is our understanding that these particular generators are made by the Dorman Company in England and marketed in this country by Fairbanks-Morse. We will accept the Fairbanks-Morse Company generators that are manufactured in this country. We request that you resubmit the generators." (MX 49) On March 20, 1969, Lacefield disapproved other shop drawings for the emergency generators stating only, "The generator sets submitted are not considered equal to those specified." (MX 50)

60. Ernst forwarded the disapproved submittals to Fairbanks-Morse on March 26, 1969, accusing Fairbanks-Morse of substituting items and placing the burden on it to obtain approval. Ernst pointed out that the delay in approval was already causing problems in the progress of the work and demanded immediate resolution of the problem to

avoid far more serious consequences. (MX 430)

61. On April 8, 1969, Fairbanks-Morse telephoned McCauley to discuss further the generator situation. McCauley told Fairbanks-Morse that its disapproval of the proposed Fairbanks-Morse engine generators was based primarily on a concern over the future availability of repair parts for the engines, a point nor required or mentioned in the specifications. McCauley did not indicate that it was rejecting the equipment because the engines were imported. By letter of April 14, 1969, Fairbanks-Morse assured McCauley that the same type of engines had been used satisfactorily in many installations for many years and enclosed a list of 33 installation locations and dates. Fairbanks-Morse stated that its decision to change marketing procedures on the engine would have no effect on its responsibility to maintain service parts for the engines and other components of the system. Fairbanks-Morse offered to guarantee and furnish a bond, if requested, that the parts would be available for at least 10 years. Fairbanks-Morse also stated that the standard warranty would be in effect on the equipment. (MX 51)

62. By its letter to Fairbanks-Morse dated April 11, 1969, Ernst reviewed "the positive points of advantage we may have in our goal of getting approval on your package." After reviewing the arguments which could be made in response to Lacefield's reasons for rejecting the generators, Ernst proposed a meeting between Ernst and Fairbanks-Morse to "coordinate and finalize our approach" in winning approval of the Fairbanks-Morse units. (MX 431)

63. On April 18, 1969, Ernst wrote Fairbanks-Morse stating in part, "In answer to your letter dated 1 April 1969, and supplementing my letter of 11 April 1969, I offer the following items that perhaps need further examination prior to resubmittal as they deviate from the letter of the specifications if not the intent." (MX 433) Ernst then listed twelve alleged deviations, including the fact that the engines were foreign made.

64. A meeting was held in McCauley's offices in Birmingham on April 21, 1969, attended by representatives of McCauley, Manhattan, Ernst and Fairbanks-Morse. The positions taken and statements made at that meeting are particularly illustrative of efforts by Fairbanks-Morse to gain approval of equipment which it knew did not comply with the requirements (MX 433) and of McCauley's failure to take decisive action which it, as the architect, had authority to take. Both of these caused the inordinate prolongation of the generator dispute and the damaging delays to construction progress on the project.

(a) At the outset of the meeting, McCauley and Lacefield explained that every component of the emergency generator system had been approved as submitted, with the exception of the engines. The only reasons for rejection of the engines were:

1. They were not a standard product of Fairbanks-Morse.

2. They did not meet the horsepower requirements of the specifications.

(b) Lacefield said that when he named Fairbanks-Morse in the specifications as an acceptable supplier, he had in mind a direct-opposing piston engine actually made by Fairbanks-Morse, rather than the Dorman engines made in England.

(c) Fairbanks-Morse stated that the generator units submitted had been its standard product since 1960 and were widely accepted. The engine referred to by Lacefield was said to be a marine-type engine, far exceeding the specification requirements and far more expensive. Fairbanks-Morse assured that the units submitted complied completely with the specifications and that it was fully cognizant of the critical importance of emergency generators in a hospital.

(d) When Lacefield questioned the horsepower capabilities of the engines, Fairbanks-Morse agreed to arrange and pay for independent testing of the en-

gines to demonstrate their horsepower outputs. Fairbanks-Morse was willing to state 750 brake horsepower on the engine nameplates.

(e) Fairbanks-Morse said that Dorman had asked to discontinue it as the prime distributor for its engines, but that the change in marketing arrangements would not affect the availability of parts or Fairbanks-Morse's ability to furnish Dorman equipment.

(f) Lacefield promised to review and answer all pending questions and requests for clarification of the generator system drawings.

(g) McCauley stated that in its opinion the proper procedure to be followed would be to resubmit the equipment for approval. Fairbanks-Morse agreed to prepare a complete resubmittal of all equipment and auxiliaries for approval. (MX 53) Thus, six and one-half months after the Fairbanks-Morse units, had been first submitted for approval and subsequently rejected, the result of the meeting was to start the entire process over again from the beginning at a time when construction progress was already seriously impeded.

65. As it had agreed in the April 21 meeting, Fairbanks-Morse hastily prepared a complete package of material and information to resubmit for approval of the previously-rejected emergency generator system. It was sent by Fairbanks-Morse via Ernst and Manhattan on May 2 and received by McCauley on May 12, 1969. (MX 56) It was referred to Lacefield for review. On May 23, 1969, Lacefield dispproved the resubmittal. (MX 54) On May 28, 1969, he returned it to McCauley "Not Approved as Noted and Approved as Noted". (MX 57) The rejected resubmittal was returned via Ernst to Fairbanks-Morse on June 9, 1969. (MX 59) This unwarranted process or resubmission and double rejection of the same equipment wasted a total of 49 days and further delayed construction progress.

66. John Carter, the manager of Ernst's office in Gulfport, Mississippi,

who had direct responsibility for the project, sought advice from Johnson, Ernst's Vice President, on June 6, 1969, as to how he should proceed with the generator matter. On June 10, 1969, Johnson told Carter in an inter-office communication that under no circumstances should the purchase order contract with Fairbanks-Morse be cancelled. He instructed him in part:

"A complete submittal should be returned to Fairbanks-Morse, along with a covering letter stating the following:

We are very close to having a perfect submittal; however, there are a few areas as pointed out by the comments of the Architect/Engineer, on which he can still base disapproval on sound ground. We must work toward eliminating these few remaining areas of referring to and reading very closely the specifications and setting down on the drawings all requirements so as to reflect complete compliance with the requirements as spelled out in the specifications. We are determined to force approval as long as the facts, statements, etc. shown on the drawings indicate substantial compliance with the requirements as stated in the specifications."

Mr. Carter followed Johnson's instructions and on June 11, 1969, wrote Fairbanks-Morse with suggestions for preparation of still another submittal on the rejected generators. Ernst said in part:

"In an effort to clarify the new submittal based upon the Architect/Engineers disapproved drawings, we ask you to provide the following as a minimum requirement, and add any pertinent facts you deem necessary to fully comply with the plans and specifications. (A)1. Your 'Engine' proposal must include all items covered in the specifications. I suggest your submittal be given with a word-for-word copy from the specifications." (MX 435)

67. On July 1, 1969, Fairbanks-Morse sent a resubmittal covering all items of the generator system which Lacefield had disapproved or questioned

in May. This resubmittal was, in effect, a word-for-word copy of the specifications, including references to the pages of the specifications from which the information was taken. This was forwarded to and received by Lacefield on July 17, 1969. (MX 59) Lacefield reviewed this resubmittal and made several handwritten comments. He noted that the engine horsepower curve did not contain sufficient information on the test conditions. Conditions weren't stated for the generator output and ratings. He said that the stated engine horsepower of 950 and 1800 RPM did not agree with the curves submitted earlier and the published information concerning the engines. He repeated that the engines were not a standard product of Fairbanks-Morse. On July 25, 1969, he stamped the submittal "Submit specified item" (MX 59) and returned it to McCauley on August 11, 1969. (MX 60)

68. On September 2, 1969, Fairbanks-Morse talked by telephone with Lacefield about the emergency generator system situation. Lacefield stated that he wanted to have an unbiased observer witness a test of the engines at 950 horsepower run at Fairbanks-Morse's Beloit plant under operating conditions duplicating those of the job site. Although it had volunteered during the April 21, 1969, meeting to pay for independent testing, Fairbanks-Morse now refused to perform the tests unless the expenses were reimbursed by Ernst and unless it was agreed that, upon satisfactory completion of the tests, " . . . there will be no further conversation regarding these engines being, or not being, Fairbanks-Morse standard products." (MX 65) It was also suggested by Fairbanks-Morse that all verbal commitments of Lacefield be reduced to writing. (MX 65) Ernst informed Manhattan that the tests under discussion were beyond the requirements of the specifications and would be performed only if someone bore the expense. (MX 65)

69. Fairbanks-Morse wrote Ernst on September 23, 1969, again arguing that its generator units should be approved. It said that any engine which it had marketed for 10 years should be considered its standard product. Fairbanks-Morse sought to sidestep the question as to the horsepower capability of its engines by stating, "This question of ability to produce that level of horsepower (950) is academic because the only real interest on the part of the user is, we are sure, will the engine produce 600 KW continuously and 660 KW in any 2-hour period." (MX 66)

70. In his letter of September 19, 1969, Lacefield told McCauley that, based on published data, he was of the opinion that the engines proposed by Fairbanks-Morse did not meet the requirements of the specifications. He said that another Fairbanks-Morse model ten-cylinder engine would comply. The specifications, however, required a twelve-cylinder engine. (MX 67) McCauley sent Lacefield's letter to Manhattan, commenting that Fairbanks-Morse had created its own problem by submitting conflicting and inconsistent data. It asked for verified performance test results supporting the horsepower curved at the expense of Fairbanks-Morse. McCauley then said, "The motor generator as originally submitted is disapproved and until satisfactory reports and tests are received verifying that it meets the specifications, we cannot approve this motor generator." (MX 67) Thus, McCauley continued to invite further submittals on the generator units which it had already rejected for other reasons. It thereby prolonged the delay in construction. Manhattan forwarded these letters to Ernst.

71. On October 1, 1969, Fairbanks-Morse wrote to Ernst: "The Fairbanks-Morse model engines proposed for the contract will produce 950 horsepower for 24 hours as defined in the contract specifications. . . ." That letter was signed by a vice president and general manager of Fairbanks-Morse, and his signature was notarized. (MX 68) This was intended to be the requested "certified proof of engine performance".

(MX 69, last page, item 22; MX 78, page 12)

72. McCauley called a meeting on October 30, 1969, to attempt to resolve the generator problems. (MX 74) The meeting was attended by representatives of all of the parties.

(a) McCauley stated that the only item that was disapproved or rejected was the engine and that this item was only rejected on the basis that in its opinion the engine was not a standard product of the manufacturer, Fairbanks-Morse. Fairbanks-Morse again argued that it must be its standard product because "quite a few" of them had been sold. In response to a direct question, Fairbanks-Morse said it had given up its distributorship for Dorman engines in the second quarter of 1969. Fairbanks-Morse also reiterated its prior assertion that it would furnish parts and service for its equipment for 10 years.

(b) When the horsepower of the Dorman engines was questioned, Fairbanks-Morse stated that the proposed equipment met all the requirements as stated in the specifications. It also said that the proposed units were the only Fairbanks-Morse products which met the specification requirements.

(c) Lacefield produced a booklet containing comparative data on various generator units and stated that the Dorman engines were shown to have 827 horsepower.

(d) Lacefield said that when he listed Fairbanks-Morse as an acceptable supplier of the generator units in the specifications, he had in mind a Fairbanks-Morse unit other than the one proposed by Ernst. It was then shown that the unit referred to by Lacefield was longer than the length specified.

(e) Fairbanks-Morse was reminded of its offer on April 21, 1969, to perform tests to prove the performance of the Dorman engines. Fairbanks-Morse said that there had not been a timely acceptance of that offer.

(f) Providence stated that the proposed Fairbanks-Morse equipment was rejected and that the contractor would be directed to submit an engine generator unit to meet the specifications. (MX 78)

73. On November 3, 1969, McCauley wrote to Manhattan confirming rejections on the proposed Fairbanks-Morse equipment at the October 30 meeting. McCauley noted that Ernst had declared during the meeting that, if Ernst furnished the emergency generator sets, they would be the Fairbanks-Morse equipment as submitted and nothing else and that considerable further delay would result. Also noted were the conflicting and spurious performance curves which had been submitted and Fairbanks-Morse's discontinuance of its distributorship for the English-made Dorman engines. McCauley stated that the other Fairbanks-Morse model ten-cylinder engines would be acceptable and that the size restrictions could be waived. (MX 77) Manhattan sent a copy of McCauley's letter to Ernst, requesting action as soon as possible. (MX 77) On November 17, 1969, Fairbanks-Morse repeated its assertion that the proposed equipment complied with the requirements of the specifications. (MX 80)

74. On December 5, 1969, Manhattan requested that McCauley take some definitive action on the emergency generator matter. (MX 84) On January 16, 1970, the request was repeated. (MX 86) Again, on January 27, Manhattan asked McCauley to resolve the impasse, since under the contracts only the project architect had the power to do so. (MX 88, pg. 8) On January 23, 1970, Manhattan notified Providence that it requested an unlimited extension of the completion date due to McCauley's lack of cooperation. (MX 88, pg. 10)

75. On February 19, 1970, McCauley sent to Manhattan, Providence and the State Health Department the promised listing by Lacefield of the reasons for

rejection of the proposed Fairbanks-Morse generator sets. Lacefield said:

(a) The Dorman engines were not a standard product of Fairbanks-Morse and were not advertised by it in the 1968 edition of *The Diesel and Gas Turbine Catalog*. The other Fairbanks-Morse model was advertised.

(b) The performance curve submitted by Fairbanks-Morse in December of 1968 showed the continuous horsepower output of the Dorman engines to be 830. With adjustments for water temperature, the horsepower would be even less.

(c) His investigation had revealed that there had been a great deal of trouble experienced with the Dorman engines.

(d) The Dorman engine did not meet the requirements of the specifications.

(e) He did not "feel" that he could approve the engines. (MX 92)

Manhattan transmitted this information to Ernst with a request for an immediate re-evaluation of the generator situation. (MX 93)

76. On the same day, February 19, McCauley notified Manhattan and Providence that, at the request of Clay Dean of the State Health Department, a meeting would be held on March 2, 1970, to make a final disposition on the emergency generator. (MX 88, pg. 9) That meeting was held in Mr. Dean's office in Montgomery on March 6, 1970.

(a) Mr. Dean reviewed the specifications and stated that " . . . he could see no objections or problems with the generator set that was proposed and asked McCauley what the problem was." (MX 95, pg. 3) McCauley and Lacefield responded that the proposed generator units were unacceptable because they were not standard products of Fairbanks-Morse; the engines being made by Dorman.

(b) Ernst replied that Fairbanks-Morse had guaranteed to all parties that the units proposed would satisfy all aspects of the specifications and had offered to perform tests and any other requirements. McCauley's reply was that the owners did not want Fairbanks-Morse units. (MX 95, pg. 3)

(c) Mr. Dean advised McCauley and Providence that he felt sure that this project was already in trouble due to these delays. He remarked that any time a specified material was rejected it had to be spelled out in writing why it was rejected. He noted that this generator was rejected numerous times and marked not approved for reasons noted, but no notations made. (MX 95, pg. 3)

77. Another meeting was held on March 10, 1970, in McCauley's offices in Birmingham. At that meeting McCauley advised Manhattan that, "We will accept the generator providing you perform tests in which Mr. Lacefield will set the criteria of the tests for the generator to be tested under and providing that you will assure us on a gentlemen's (sic) word that there will not be a lawsuit." (MX 96) Manhattan refused the offer. McCauley in return stated, "Well, we will accept the generator," and instructed Lacefield to write the criteria on which he wanted the generator sets tested by Fairbanks-Morse. Lacefield promised to furnish the test criteria promptly. (MX 96)

78. On March 16, 1970, still another meeting was held to discuss the emergency generators, this time at the job site in Mobile. At that meeting, McCauley reversed itself and disapproved the proposed Fairbanks-Morse units, notwithstanding its approval of them six days earlier. (MX 98, pg. 2) McCauley's reversal was prompted by a letter from Providence on that date which ordered it to get an approved generator installed without further delay. (MX 97) On the following day, March 17, 1970, it wrote to Manhattan: "This reaffirms our position stated in our letter of February 19, 1970, in which the engine generator as submitted by your subcontractor, was not approved." It then re-

quested submission of a generator complying with the contract documents. (MX 97) These actions by McCauley completely ignored its assurances during the March 10 meeting that the proposed Fairbanks-Morse units were approved and that testing criteria would be furnished.

79. On March 31, 1970, Lacefield wrote to McCauley reminding it that Dean, of the State Health Department, had said that the objections to the Fairbanks-Morse units on the basis that they were not Fairbanks-Morse's standard product should be withdrawn and the units accepted if they demonstrated satisfactory performance. Lacefield suggested that the proposed units be given tentative approval, with final approval to be given upon satisfactory completion of testing. This conclusion by Lacefield came almost 18 months after the original submittal. Lacefield then set out the testing requirements for the generators. (MX 101)

80. On April 3, 1970, Dean wrote a strongly-worded letter demanding that McCauley furnish a detailed statement of the particulars in which the proposed Fairbanks-Morse generator sets failed to meet the technical requirements of the specifications, if they did not, in fact, do so. He also requested a detailed statement comparing the Fairbanks-Morse model generator units, which McCauley had said would be acceptable, with the specifications.

81. Providence instructed McCauley to get approved generators installed in the project without further delay. (MX 103) However, on April 10, McCauley repeated the same request for submission of generators meeting the specifications. (MX 105)

82. On April 24, 1970, Providence told McCauley that it was holding McCauley, as the project architect, responsible for the delays and demanded immediate action. Providence pointed out to McCauley that the lack of emergency generators would prevent use of the new building upon its completion and that this would further delay Manhattan in

being able to perform the remaining renovation work in the existing building. However, on April 24, 1970, McCauley again wrote to Manhattan with the redundant request for submission of an emergency generator system which would meet the requirements of the specifications. (MX 113)

83. On April 29, 1970, Lacefield produced the oft-requested and long-awaited detailed statement of the reasons for rejection of the proposed Fairbanks-Morse units. He gave two reasons:

(a) First, the proposed equipment was not the "standard Product" of Fairbanks-Morse. Lacefield made no mention whatsoever of the fact that the engines were imported from Dorman in England.

(b) Second, that the horsepower capacity of the engines was inadequate. (MX 115)

84. On May 4, 1970, McCauley wrote to Manhattan by registered mail:

"This is to inform you that the engine generator as previously submitted has been disapproved for the above project. We request that you submit immediately an engine generator that will meet the contract documents." (MX 116)

On May 15, 1970, over nineteen months after the first submittal on the emergency generator system, McCauley wrote to Manhattan and stated in part:

"In accordance with this paragraph the Architect is designating the following equipment that will be acceptable:

1. Caterpillar 398
2. Fairbanks-Morse 38F5¼
3. General Motors

McCauley had the same power and prerogative to designate specific units and require they be supplied in November of 1968, following the disapproval of the first submittal of data on the proposed Fairbanks-Morse units. McCauley and/or its agent and consultant, Lacefield, knew at that time the very facts upon which the final rejection was

based. Lacefield knew even before the submittal was made that the proposed units were powered by diesel engines manufactured by Dorman and imported from England. (See 55 above) As early as June 1968, Lacefield knew that the published data on the units showed the horsepower to be less than required by the specifications. (MX 33; See 54 above) McCauley apparently also knew early in the proceedings that Providence did not want Fairbanks-Morse equipment installed in the project, notwithstanding its designation in the specifications as an acceptable supplier.

85. Upon receipt of McCauley's directive listing three acceptable models of generator sets, Manhattan obtained price quotations on each unit. (MX 121, 124, last page) On July 3, 1971, Manhattan submitted to McCauley for review preliminary information on Caterpillar model D398 generating units, which it proposed to furnish. (MX 128) This was referred by McCauley to Lacefield for examination. (MX 128) On July 8, Lacefield gave conditional approval to the Caterpillar units, (MX 129) which was forwarded to Manhattan. (MX 130) Manhattan sought to have Ernst purchase the generators, as it was required to do under the subcontract, but Ernst refused to do so unless it was assured of payment of over one-half million dollars in claims which it asserted for losses allegedly sustained by it as the result of delays. (MX 134)

86. On August 31, 1970, Manhattan contracted with Thompson Tractor Company of Birmingham to supply the emergency generator system, including two Caterpillar model D398 diesel-powered generators, for a total price of $137,872.53. (MX 136) This cost was $54,132.53 more than the price at which Ernst had contracted to purchase the sub-standard non-compliant Fairbanks-Morse units. (MX 136, MX 41)

87. Once it was assured that the generator units to be installed would be Caterpillar, McCauley made efforts to expedite the progress of the work. (MX 136, MX 41). It was agreed that sub-

mittal, review and approval of shop drawings, etc., could be handled directly between Lacefield and the supplier, without the necessity of forwarding and return through each contractor involved, as it had been required in connection with the proposed Fairbanks-Morse units. (Tr. 1954–6, 1969)

88. When the Caterpillar units were ordered, Thompson Tractor Company expected that the units would be ready for factory testing by the middle of December 1970, and depending on the outcome of the tests, would be delivered to the job site by January 1971. (MX 139) Because of unanticipated and unavoidable problems and delays in production, completion of the generators was delayed beyond the anticipated date. (Tr. 1958–60, 2764; EX 438) McCauley agreed to waive the rigid requirements of the specifications for assembly and testing of the generators and engines at the factory prior to shipment and permitted all tests to be run at the job site after installation was complete. (MX 145)

89. The Caterpillar engine generators were received at the job site on March 19, 1971. (Tr. 1766–7) The installation was completed and the performance tests were run on May 17 through May 23, 1971. Lacefield witnessed these tests and approved the results. The emergency generator system was given final approval by Lacefield during an inspection on June 21–25, 1971. (McX 83, pg. 15; Tr. 507) Building A was finally accepted by Providence and occupied on July 1, 1971, with the exception of the operating rooms, which could not then be used because of defects in Ernst's installation of the explosion-proof receptacles, as discussed above. (Tr. 269; PX 4)

90. The total cost to Manhattan for purchasing and installing the emergency generators system and its various components was $150,637.12. (Tr. 419) The system and its installation was to have been furnished by Ernst under its subcontract. Ernst's subcontract price

included the sum of $89,011.00 for the generator system and its installation, an amount $61,626.12 less than the actual cost to Manhattan. (Tr. 419–27) Ernst included the full sum of $89,011.00 in its billing to Manhattan for the subcontract work. (Tr. 421) Manhattan is entitled to reduce the amount due to Ernst under the subcontract by the entire amount of $150,637.12 which it cost to obtain and install the emergency generator system.

91. In turn, Fairbanks-Morse is liable to Ernst under their contract for the difference between the purchase price of the emergency generator system, as incurred by Manhattan and refunded by Ernst, and the price of the proposed Fairbanks-Morse system, to wit: $137,872.53 minus $89,011.00 or a total of $48,861.53.[5] Additionally Fairbanks-Morse is liable to Ernst for other damages which Ernst has incurred as a result of Fairbanks-Morse's breach of their contract. Thus, Fairbanks-Morse is liable for the additional installation costs incurred by Manhattan and refunded by Ernst which were in the amount of $12,764.59. As a result, Fairbanks-Morse is liable to Ernst in the total amount of $61,626.12.

92. The emergency generator system was an essential component of the project in that, until it was operative, Building A could not be occupied and used by Providence even if all other work was completed and accepted. (MX 102) Because of the inordinate delays discussed above in obtaining a decision as to the generator units which were to be purchased and installed, these components were not available for installation at the appropriate time in the construction sequence. This delayed not only the other work which could not be done before the generator system was installed, but also delayed the ultimate completion of the project. (Tr. 2071, 2584–9, 2619, 2636, 2646) Although much of the work in Building A could go on without the generators being in place, when it unavoida-

bly became generally known that installation of the generators and, therefore, ultimate completion and acceptance of the building would be indefinitely delayed, a "flattening out" of, or loss of efficiency in, the progress of all work occurred. (Tr. 2595–6, 2649, 2652, 5593)

93. While it is difficult to fix with certainty the number of days that the ultimate completion of the project was extended or delayed by the dispute regarding the emergency generators, as set out at length above, the evidence establishes conclusively that, if the generators had been available for installation when they should have been Building A would have been complete and ready for acceptance and patient occupancy by January 15, 1971. (Tr. 278, 2649, 2656, 3437) The sixth, fifth, fourth and third floors of Building A were accepted on January 7, 8, 12 and 15, 1971, respectively, except for the generators. (Tr. 320, 2062–3) As found above, however, Building A was not accepted and occupied by Providence until July 1, 1971. Thus, as the proximate result of the generator dispute, there was a delay of 161 days. Since the remaining renovation work in the existing building could not be undertaken until the patients could be moved into Building A, the ultimate completion and acceptance of the project was equivalently delayed.

94. In addition to the above, it should be pointed out that the emergency generator specifications as prepared by McCauley were, in the opinion of the Court, legally deficient. McCauley, as the architect, was responsible for the drafting of accurate and complete plans and specifications and, in preparation thereof acted as an independent contractor rather than as an agent for Providence. The specifications were written in disregard of applicable regulations and requirements of both the Department of Health of the State of Alabama and HEW. As written, they did not

5. The difference in figures in paragraphs 90 & 91 for the generator system, i. e., $150,637.12 and $137,872.53, respectively, is explained by installation expenses in addition to the purchase price of $137,872.53.

comply with HEW regulations in that they failed to satisfy the requirement that the "product shall be identified by brand name, genetic name and model number and/or such other description that will clearly indicate the identity of the item." With regards to the engines for the emergency generators, the specifications provided only that they "shall be Caterpillar D–398, Fairbanks-Morse or General Motors." The only engine described in the specifications by name, manufacturer and model number was the Caterpillar D–398. In addition, the Caterpillar D–398 did not meet the engine performance requirements as laid out in the specifications, as that engine also fell short of the required horsepower output. Fairbanks-Morse, one of the other two manufacturers listed, did not manufacture any engine which could meet the performance requirements.

95. Lacefield testified that, at the time he wrote the specifications, he did not know of a single 1800 RPM engine of any manufacturer which complied fully with the specifications. (Tr. 2976) The specifications called for an output of 950 horsepower. In contrast, the published data on Caterpillar equipment showed horsepower capabilities of only 750, 850, 675 and 770. Fairbanks-Morse, which had sought a pre-bid approval of its engine, provided McCauley with data clearly showing that its engine produced 935 horsepower at 1800 RPM.

96. Finally, the specifications were also incorrect in respect to the allocation of space for installation of the engines. The Caterpillar engines were ultimately selected and installed with McCauley's approval. However, the space allocated for the emergency generator engines as provided in the architect's drawings was not sufficient to accommodate the Caterpillar engines.

97. Coupled with the deficient specifications and contributing to the delays in the project as a whole was a general failure on McCauley's part to promptly handle change orders and act upon submittals made by the various parties involved.

98. The Court is of the opinion that the deficiencies in McCauley's plans and specifications and McCauley's failure to act promptly on submittals contributed materially to the problems and delays in the installation of the emergency generator and to the overall delay in the completion of the project. Thus, McCauley must share in the responsibilities for these delays.

99. The responsibility and liability for the losses and damages resulting from this delay should be borne by the responsible parties in the following proportions: Fairbanks-Morse–50% and McCauley–50%, because of their actions and failures to act, as found above. The further issue of liability of Ernst and Fairbanks-Morse for punitive damages is hereinafter discussed. The fact that McCauley was correct in its conclusion that the proposed Fairbanks-Morse generator units did not comply with the requirements of the specifications does not, in any manner, justify or excuse McCauley from its responsibility for the delays which resulted from its mishandling of the submittals. In conclusion, Fairbanks-Morse and McCauley are each responsible for 80½ days delay in the completion date of the project.

**B. THE ISSUE OF FRAUD BY ERNST**

100. As is discussed in greater detail both above and hereinafter, Fairbanks-Morse was responsible for a considerable amount of the delay which occurred from the problems in the selection and installation of the emergency generator system and was in fact guilty of gross misconduct in its submissions to Ernst and the other parties. As to whether or not Ernst joined in this gross misconduct with Fairbanks-Morse presents an extremely close question.

101. In its cross-claim, Manhattan alleges fraud against Ernst in the emergency generator phase of this litigation.

This alleged fraud is based upon a series of correspondence between Ernst and Fairbanks-Morse concerning the emergency generator units. This correspondence has already been discussed in detail above in paragraphs 63 and 66.

102. The problem presented is whether or not this series of correspondence when taken together ties Ernst into the fraud perpetrated by Fairbanks-Morse. The Court does not think that it does. It must be remembered that these documents were not drafted by lawyers. Had the authors of these documents realized that the documents would ultimately wind up in court and be scrutinized by skilled lawyers, they would have sought the assistance of their various legal departments for the drafting of these documents. The facts, however, are that they were drafted by engineers in an effort to fulfill a contract of considerable size. If contractors, subcontractors, engineers, architects and owners, in attempting to carry out a sizeable contract, sought legal assistance in the drafting of all letters and inter-office correspondence, such contracts would never be performed.

103. Manhattan insists that the phraseology used in the June 11, 1969, letter from Ernst to Fairbanks-Morse, namely, "I suggest your submittal be given with a word-for-word copy from the specifications", (MX 435) shows that Ernst realized that the emergency generator did not meet the specifications but, nevertheless, insisted that the resubmittal be word-for-word from the specifications. The Court does not agree with Manhattan's interpretation of that letter. It seems to the Court that it is susceptible to a different interpretation. The Court would interpret the letter as saying, "If your product meets the specifications which are herein set out, resubmit it, if it does not, say so, and we will go elsewhere."

104. To this extent the document is ambiguous, and the Court realizes that under ordinary circumstances it would be construed more strongly against the drafter. But on the other hand, Manhattan is the one asserting the fraud. Therefore, the burden of proof is on Manhattan to clearly and unequivocally establish that fraud did exist. The Court feels that Manhattan has failed to present evidence sufficient to establish fraud on Ernst's part.

## C. THE ISSUE OF FRAUD BY FAIRBANKS-MORSE

105. It is unusual when overt fraud in business transactions can be proved and documented. But in this case, such fraud has been proved clearly and cogently principally by material from the files of the guilty party. Fairbanks-Morse continuously sought to obtain approval of the proposed emergency generator units by means of flagrant and false representations, while knowing full well that the units did not comply with the requirements of the specifications.

106. In 1961, Fairbanks-Morse had become the franchise distributor in America for diesel engines manufactured in England by W. H. Dorman and Company. Fairbanks-Morse placed on all such engines its own nameplates identifying itself as the manufacturer. (EX 588) The engines, included in the units which Fairbanks-Morse and Ernst proposed to install in the project, were identified by Dorman as Models 12 QTCW and by Fairbanks-Morse as Model 50 A6 TCW 12V. (Tr. 4261, 4634; EX 631)

107. In February 1971, the Court determined that these Dorman engines did not meet the requirements of the specifications for this project. Perhaps Fairbanks-Morse could have stood on the position that its equipment was "equal" to the Caterpillar D–398. However, Fairbanks-Morse went further and represented that its equipment could meet the specifications. The Court finds Fairbanks-Morse guilty of fraud and bases this finding on the following points discussed below which were documented during the trial.

108. At all relevant times, Fairbanks-Morse knew that its equipment

could not satisfy the performance specifications for the project. Such times include the time when Fairbanks-Morse bid its equipment for use on the project the time of Fairbanks-Morse's several submissions through Ernst and Manhattan to the architect, the time of commencement of this action in October 1970, and the time of trial of the declaratory judgment count in February 1971.

109. Fairbanks-Morse intended to supply engines on the project which not only were in a cannibalized condition, but which had previously been sold by Fairbanks-Morse to other customers and, after failures, returned by them to Dorman to be rebuilt and repaired. The specifications clearly required that all equipment installed on the project had to be new equipment.

110. Fairbanks-Morse knowingly misrepresented to the other parties that its proposed equipment would meet the specifications. It was on the basis of such continued misrepresentations from responsible officials of Fairbanks-Morse that the other parties continued to discuss the possibility of accepting the Fairbanks-Morse equipment. Covertly and not revealed until the actual trial of this action, Fairbanks-Morse knew that any claims which it made regarding compliance with the specifications had already been disproved by Dorman and that Dorman would specifically refuse to endorse claims of the nature and to the extent that Fairbanks-Morse was making to the other parties. Fairbanks-Morse also hid the fact that its own representatives acknowledged orally and in writing among themselves that the proposed equipment did not meet the requirements of the specifications and did so at the very same times that Fairbanks-Morse was proclaiming to the parties here that the equipment did comply.

111. Fairbanks-Morse had been guilty of a program of deliberately overrating of Dorman engines and persisted in such flagrant misconduct despite protests and written objections by Dorman. For more than one year prior to the bidding on this project, Dorman had been telling Fairbanks-Morse that Fairbanks-Morse was unjustifiably overrating their engines in its sales and promotional brochures, that there was no justification for the overrating and that Dorman objected. Fairbanks-Morse knew that any overrating of the engines constituted the violation of, and avoiding of, Dorman's guarantee as manufacturer.

112. For the purpose of this project, Fairbanks-Morse created curves which were misdated, were based upon no testing data and were inconsistent with other performance curves not only supplied by Dorman but actually in Fairbanks-Morse's possession. Fairbanks-Morse did this in its attempt to convince the other parties involved that the Dorman engines would meet the performance specifications of the project, although Fairbanks-Morse knew they would not.

113. Fairbanks-Morse experienced an unbelievable history of performance failures, warranty claims and the like in its distribution of the Dorman engines. This played a primary role in leading to the eventual termination of the relationship between Fairbanks-Morse and Dorman. Contrary to Fairbanks-Morse's representations to the effect that Dorman was the instigator of the termination of their relationship, Fairbanks-Morse's own records showed that it was Fairbanks-Morse which initiated and demanded the termination.

114. When the facts reviewed in the foregoing paragraphs are considered with the matters reviewed in Findings 50 through 99 concerning the difficulties and losses resulting from the delays in finally obtaining approval of an acceptable emergency generator system for the project, the finding is inescapable that Fairbanks-Morse knowingly, deliberately and flagrantly represented falsely the quality and performance capabilities of the proposed Dorman-powered generators in an effort to have them approved for installation in the project. These misrepresentations were made by Fairbanks-Morse with the knowledge and ex-

pectation that they would be believed and relied upon by other parties. The other parties did rely upon the misrepresentations with the result that the project was delayed and substantial losses were incurred.

115. Under all the facts the Court finds that it is just and proper that Fairbanks-Morse be required to pay punitive damages to Manhattan and Ernst because of the fraud committed upon them with regard to the emergency generator system. There is no yardstick by which the assessment of punitive damages can be measured except that the greater the wrong the greater the damage. In this instance, the price of the generator units proposed to be furnished was $81,000.00. Any figure close to, or exceeding this amount, would be disproportionate. The Court finds that the total amount to be assessed against Fairbanks-Morse as punitive damages is $40,000.00 to be paid in equal amounts of $20,000.00 to both Manhattan and Ernst.

### The Issue of Delays by Providence

116. Manhattan and Ernst insist that Providence is responsible for further delaying the completion of the contract because of its failure to release to Manhattan space in the existing building as rapidly as it should have been. They are looking at this through the eyes of contractors trying to perform work. Providence had to look at it from a two-fold purpose; first, and primarily, from its duty and responsibility to operate a hospital in an efficient manner during the time in question. Providence could not possibly release the operating rooms in the existing building until the operating rooms in Building A had been completed in all respects if the surgical needs of the entire hospital were to be met. Secondly, Providence had to look at it from a standpoint of releasing space in the existing building as rapidly as possible to Manhattan as set out in the plans and specifications. With the exception of the 39 days delay heretofore discussed in Paragraph 14, the Court does not feel that Providence should be charged with any further delay in the completion of the contract due to the manner in which it released space in the existing building.

### The Issue of Manhattan's Supervision

117. The Providence Hospital project was fraught with many problems and delays which should be attributed to the lack of proper management, coordination and supervision by the general contractor. The following findings relate to matters which are the responsibility of Manhattan.

118. A continual problem which contributed substantially to the development of other problems and to considerable delays was Manhattan's failure to coordinate properly the work on the job. Manhattan failed to prosecute the work with such diligence which would assure its completion within the time specified for completion as enlarged by the duly authorized extensions of time. Under paragraph 21(c) of the general conditions of the construction contract, Manhattan was responsible for the coordination of the trades, subcontractors and materialmen engaged upon the general contractor's work. Pursuant to paragraph 21(c), Manhattan was responsible for any lack of coordination and/or poor general administration of the project. There was ample evidence of this lack of coordination and supervision during the course of the trial. (Tr. 3323, 3339-4, 4363-4, 4368, 3327-9, 3343, 3326-7, 3496-7, 3475-6, 4235, 3483, 4187; EX 371, EX 318, EX 71, EX 454)

119. There were substantial delays in the performance of a number of items of work which were the responsibility of either Manhattan alone or Manhattan's subcontractors which are not parties to this action. The responsibility for these delays rest with Manhattan and cannot be passed on to any of the other parties. Manhattan's Ex. 299 is a bar chart which was especially adapted for the trial. It shows not only when the work was scheduled to be done but also when

the work in fact was performed. This exhibit reflects delays in the following areas: The concrete work on the floor slabs for the new buildings and on the roof, the face brick work, the concrete block work, the structural glazed tile, cast stone work, limestone and greenstone work, structural and miscellaneous steel work, carpentry work, millwork, wood door work, roofing and sheet metal work, membrane and waterproofing work, caulking work, hollow metal doors and framework, window work, protection screen work, aluminum doors and frame work, glass and glazing work, painting work, vinyl wall fabric work, ceramic and quarry tile work, mastic conductive work, carpet work, acoustical treatment work, lath and plaster work and finished hardware work.

120. Another problem which contributed to the delays in the project was Manhattan's failure to provide additional manpower, including double shifts, when requested to do so by McCauley and required by the general conditions of the construction contract. That contract provided as follows:

"In the event that the contractor shall for any reason fall behind schedule, he shall promptly put double shifts of labor on the work and take such other steps as the architect may require to expedite the work to insure that it shall be fully completed within the stated time."

In spite of requests for more manpower, Manhattan did not comply with this provision except in the most minimal respects. (Tr. 390, 1825, and 3517–8)

121. Manhattan also failed to schedule work properly. Unknown to its subcontractors Manhattan had contemplated that there would be an additional period of one year beyond the contract's specified completion date within which renovation work could be performed without penalty. Thus, as contemplated by Manhattan, the total original contract time would have been three years. Despite this, Manhattan prepared a bar chart schedule for the performance of the work, which was approved by Providence and McCauley and which depicted the entire performance of the project within 730 days. The bar chart did not indicate any additional grace period for performance of the renovation work, as contrasted with new construction, either by the general contractor or by any subcontractor. Thus, the chart as finally approved purported to show the performance of the total contract within the two year time frame, including the renovation work. This was so despite the fact that Manhattan personnel who were witnesses at the trial testified that they believed that there was to have been an additional one year for performing the renovation work. (EX 103; Tr. 2731, 2719, 2735, 2740) It was also their testimony that until 1972 they were never aware that Providence even conceived that there could be a claim for liquidated damages without allowing at least one year beyond the contract time completion date for performance of the renovation work. (Tr. 2739, 2740) In addition and contrary to conventional and proper practice, there was no bar chart for the performance of this project until March 31, 1969, which was more than six months after the starting date. (Tr. 2700, 2226) Due to the inaccuracy and inconsistencies manifested by the Manhattan bar chart, the project incurred additional delays.

122. While it is impossible with any degree of accuracy to apportion to any particular part of the work the number of days of delay caused thereby, nevertheless, Manhattan's failure to supervise and coordinate the work did cause considerable delay which the Court fixes at sixty days. Manhattan attempted to exonerate itself as being the cause of any delay and attribute it to the other litigants. As to this they bore the burden of proof which the Court does not think they met. Accordingly, the Court assesses sixty days as the amount of delay to be charged to Manhattan for its failure to properly supervise and coordinate the work.

### Is Providence Entitled to Judgment Over Against McCauley

 123. The Court recognizes the well established proposition that an architect is the agent for the owner and the owner is responsible for any damages caused by the architect's deficiencies insofar as other parties are affected thereby. In the instant case, Providence has claimed over against McCauley for certain days for which Providence has been held liable to other parties. Insofar as any penalty which has been charged to Providence as a result of McCauley's inefficiency, the Court finds that McCauley is liable to Providence under Providence's claim over against McCauley.

 124. No contractual agreement existed between McCauley and Providence concerning liquidated damages arising from delays in the completion of the project as was provided for in the contracts between Providence and Manhattan and Manhattan and Ernst. However, McCauley itself was instrumental in the inclusion of the $250.00 liquidated damages provision in the Providence-Manhattan contract. It is therefore reasonable to utilize that amount in awarding damages as between McCauley and Providence for delays in the completion of the project which were caused by McCauley.

125. The Court has found above that, in regard to the selection of the bed light fixtures and the emergency generator system, McCauley was responsible for 29½ and 80½ days of delay, respectively. Therefore, the Court finds that McCauley is liable to Providence for a total of 110 days of delay in the completion of the project or a total of $27,500.-00 in damages.

### Arbitration

 126. Providence filed motions to dismiss for failure to arbitrate certain of the elements of controversy which were denied by the Court. Disagreements commenced as early as 1969 and continued up until the date of the trial in 1973. During the 33 months period in which the suit was pending prior to trial, Providence participated actively in extensive discovery proceedings in preparation for trial. It at no time sought to start arbitration. Manhattan wrote several letters to Providence and Ernst seeking cooperation in activating the arbitration procedure. In fact, Providence at one time stated that if Manhattan should persist in its efforts to arbitrate, Providence would prevent the same by filing the law suit. The law is clear that the failure to invoke the provisions of permissive arbitration is the equivalent of a waiver of such provisions. The inactions of Providence in this regard was tantamount to such waiver.

### Attorney Fees

 127. Providence seeks to recover attorney's fees and expenses against Manhattan under indemnity provisions of their contract. While the contract does contain an indemnity provision, it does not cover any fees and expenses incurred by providence in this litigation. The indemnity provision of the contract includes only costs, expenses and attorney's fees for damage to property or bodily or personal injuries arising from construction activities or the construction contract, none of which exist in this litigation.

128. The contract between Manhattan and Ernst does contain an indemnity provision by which Ernst agreed that if Manhattan should become liable to Providence for delay in completion of the project and if the delay was caused by Ernst's failure to perform its subcontractual obligations in a timely manner, Ernst would pay the full amount of Manhattan's liability to Providence and would in addition reimburse Manhattan including costs and attorney fees. Ernst did in fact cause delays in the ultimate completion of the contract for which Manhattan is technically liable to Providence. However, as pointed out above, Manhattan is in turn entitled to

recover from Ernst liquidated damages for each such day of delay caused by Ernst. It would be difficult, if not impossible, to a certainty to allocate attorney fees and expenses to that delay. Furthermore all claims among the parties were litigated in the trial and each party represented itself and only itself. Manhattan did not expend attorney fees in defense of any claims arising from delays caused by Ernst, but to the contrary, actively asserted Ernst's responsibility and liability for those delays. An award of attorney fees to Manhattan and against Ernst is therefore not warranted, nor is such mandated by their contractual agreement.

129. Both Manhattan and Ernst seek indemnity against Fairbanks-Morse for attorney fees and expenses. The Court has heretofore found Fairbanks-Morse guilty of fraud and for such has fixed punitive damages in favor of both Manhattan and Ernst. Without characterizing the elements constituting the quantum of punitive damage, suffice it to say, the Court does not feel that any additional amount should be added to this for attorney fees and expenses.

130. In summation regarding attorney fees and expenses, the posture of the case at bar is such that all parties involved were to some extent at fault. All parties had the opportunity to settle, but chose to litigate. Each party defended only its own interests and asserted only its own claims and defenses. Consequently, the Court feels and so rules, that each party-litigant bear its own attorney fees and expenses.

### Tube-O-Matic

131. Manhattan incurred an indebtedness to Tube-O-Matic, Inc. for the work and material on the Providence Hospital job to be provided or furnished by Tube-O-Matic, Inc. Ernst performed certain work installing or working with the Tube-O-Matic company for which Tube-O-Matic has not paid Ernst. By agreement at the request of Ernst and with the permission and concurrence of Tube-O-Matic (EX 527), Manhattan was directed to pay that amount of $11,265.-23 to Ernst to which no exception has been taken. Manhattan's accountant, Groth, testified that the books showed that an amount had been held and was due on the Tube-O-Matic account (Tr. 5443), although his version of that amount was $10,212.36. By virtue of the agreement whereby Manhattan advised that it did have enough money due Tube-O-Matic to satisfy the Ernst account and that that money be kept pending Ernst's final estimate (EX 527), and the agreement by Tube-O-Matic (EX 527) consenting to such payment, and bearing in mind the rights Ernst otherwise would have had (but did not pursue, in view of this arrangement) to attempt to insure payment from Tube-O-Matic by either lien rights or action under the payment bond furnished by Manhattan to guarantee that all bills of all subcontractors, suppliers and laborers would be paid, Ernst is entitled to be paid from the fund held by Manhattan in the sum of $11,265.23.

### CONCLUSIONS OF LAW

On the basis of the foregoing facts, the Court makes the following Conclusions of Law:

1. The Court has jurisdiction over all the parties and subject matter of this litigation under the Statutes of the United States by reason of diversity of citizenship among the parties and the amount in controversy.

2. The Court has attempted to adjudicate all issues raised by the pleadings, pretrial order, and all issues as presented by the evidence, and the pleadings are deemed amended to encompass all such issues. No judgment is issued against any party on a claim on which said party did not have a complete and fair opportunity to present.

3. The construction contract entered into between Manhattan and Providence provides for a payment by Manhattan to Providence of the sum of $250.00 per day for each day that completion of the project was delayed be-

yond the date specified in the contract. The delays and the parties responsible therefor have heretofore been determined as set out in the Findings of Fact. The agreement of Providence and Manhattan upon the sum of $250.00 per day for each day of delay is reasonable and binding upon them. (That agreement fixes and limits the right of Providence to recover damages for failure to complete the project within the time specified.)

4. Providence had the right under the construction contract to require Manhattan to perform the renovation of the existing building at times acceptable to Providence. Having the right to schedule the work Providence was required by law and in equity to schedule such work in a reasonable manner with due regard to their responsibility to the public to keep its hospital facilities operational during the carrying out of the contract. This they did, except as hereinafter referred to in Conclusion of Law No. 5.

5. As heretofore found, Providence, due to its handling of the sewage ejection problem, is charged with 65 days delay in the ultimate completion of the contract and the same is true of its and McCauley's handling of the Palco lighting fixture situation in the amount of 59 days and the releasing of space in the old building in the amount of 39 days. Therefore, Providence cannot recover from Manhattan liquidated damages for these periods.

6. As stated in Findings of Fact No. 2 hereinabove, all valid issues raised by the pleadings, pretrial order and the evidence have been treated in this order. The question of whether or not Providence owes McCauley any balance under its contract was not raised. As shown in the Findings of Fact, supra, the Court has found that Providence is entitled to a judgment against McCauley for damages to Providence as a result of McCauley's inefficiencies. This is exclusive of any amount which Providence may owe McCauley under the contract.

7. No award is made to any party for indemnity for attorney fees and expenses for the reasons heretofore set out. Additionally the Court feels that the great majority of fee time and expenses were necessitated in the preparation and presentation of affirmative claims against the various litigants and was not in defense of any claim being asserted against the particular litigant. It would be simply a speculative attempt to allocate that portion of the fee and expenses attributable to merely defensive matters.

8. During the litigation the contention was made by Providence that Manhattan's claim should be held in abeyance or denied because of failure to resort to arbitration. Providence's entitlement to arbitration is permissive and cannot operate to deny to a party its right to present its claim in a court of law. A litigant cannot fail to invoke permissive arbitration provisions of a contract and then attempt to advance this failure as a defense to claims asserted against it.

9. Fairbanks-Morse has asserted defensively that the claims for punitive damages of Manhattan, Ernst and McCauley on the grounds of fraud are barred by the Statutes of Limitations for the State of Alabama. The applicable statute requires that claims based upon fraud must be filed within one year after the alleged fraud was actually or should have been discovered by the claimant. Fairbanks-Morse urges that all parties should have been made aware of this deception, if any there was, by the evidence presented on the hearing as to the sufficiency of the generator units in January and February 1971. The Court finds that the claim for fraud is not barred by the Statute as the more flagrant facets of this came out in discovery within only months prior to the commencement of the hearing on its merits.

10. When misrepresentation and fraud have been established by clear, cogent and convincing evidence, it is ap-

propriate and proper for the Court to award not only actual damage caused thereby, but also punitive damages in an appropriate amount.

11. Damages actual and punitive as found above will be awarded by the Court in favor of and against the respective parties.

12. On October 2, 1973, as shown on Page 5605 of the transcript, oral motions were made by Ernst, Fairbanks-Morse and Providence to dismiss all of Manhattan's claims against these litigants. These motions were carried along with the case in chief and are now denied by the Court.

13. Any claims arising from the pleadings, counterclaims, cross-claims or pretrial order, to which the Court has not specifically addressed itself in this Findings of Fact and Conclusions of Law, are hereby denied.

A Judgment will forthwith be entered in accordance with the above Findings of Fact and Conclusions of Law.

## JUDGMENT

This cause having come on for final hearing on the pleadings and proof of the respective parties and having been taken under submission and the Court after due deliberation having now entered the Findings of Fact and Conclusions of Law, it appears unto the Court as follows:

1. That, as between Providence Hospital (Providence) and Manhattan Construction Company of Texas (Manhattan), the original contract price for the entire project was $6,117,500.00. As a result of Change Orders 1–12 in the total amount of $101,876.64, the revised contract price was $6,219,376.64. Payments made by Providence to Manhattan through May, 1972, totalled $5,887,576.-80, leaving a balance of $331,799.84. Pursuant to an order of this Court on the 27th day of July 1972, Providence paid Manhattan an additional $211,473.-79. Thus, the unpaid balance due by Providence to Manhattan on the contract

is $120,326.05. In turn, however, pursuant to its contract, Manhattan is liable to Providence in liquidated damages for 248½ days of delay in the ultimate completion of the project. This total of 248½ results from 108 days of delay caused by Manhattan's subcontractor, E. C. Ernst, Inc. (Ernst), in regard to the explosion-proof receptacles, 80½ days of delay caused by Ernst's subcontractor, Fairbanks-Morse, Inc. (Fairbanks-Morse), in regard to the emergency generator system and 60 days of delay caused by Manhattan's failure to properly supervise the construction project. When computed at the rate of $250.00 per day in accordance with the liquidated damages provision of the contract, the liquidated damages for which Manhattan is liable to Providence total $62,125.00. Therefore, after subtracting the liquidated damages from the balance yet due on the contract price, Providence is liable to Manhattan for a total of $58,201.-05.

2. That, as between Manhattan and Ernst, the original contract price for the electrical work to be performed by Ernst, including the purchase and installation of the emergency generator system, was $982,215.00. Pursuant to a change of $333.00, the revised contract price was $982,548.00. Towards this revised contract price, Manhattan has made payments to Ernst of $898,-648.00, leaving a balance of $83,-900.00 from the revised contract price. In addition, Manhattan is liable to Ernst for $11,265.23 in regard to the Tube-O-Matic novation. However, Ernst is liable to Manhattan for damages sustained by Manhattan in the purchase and installation of the emergency generator system. Those damages total $150,637.12 and Manhattan shall back charge this amount against the revised contract price and recover any excess from Ernst. In addition, pursuant to their contract, Ernst is liable to Manhattan in liquidated damages for 188½ days of delay in the completion of the project. This total of 188½ days results

from 108 days of delay caused by Ernst in regard to the explosion-proof receptacles and 80½ days of delay caused by Ernst's subcontractor, Fairbanks-Morse, in regard to the emergency generator system. When computed at the rate of $250.00 per day in accordance with the liquidated damages provision of the contract, the liquidated damages for which Ernst is liable to Manhattan total $47,125.00. Therefore, as the result of the above matters, Ernst is liable to Manhattan in the total amount of $102,596.89.

3. That Fairbanks-Morse is liable to Ernst for $61,626.12 for damages sustained by Ernst as a result of Fairbanks-Morse's breach of their contract for the purchase of the emergency generator system and for $20,125.00 in liquidated damages resulting from 80½ days of delay of the completion of the project which was caused by Fairbanks-Morse's aforesaid breach and which should be computed at the rate of $250.00 per day in accordance with their contract. Additionally, Fairbanks-Morse is liable to Ernst in the amount of $20,000.00 in punitive damages because of fraud committed by Fairbanks-Morse upon Ernst with regard to the emergency generator system. Therefore, Fairbanks-Morse is liable to Ernst in the total amount of $101,751.12.

4. That Fairbanks-Morse is liable to Manhattan in the amount of $20,000.00 in punitive damages because of fraud committed by Fairbanks-Morse upon Manhattan with regard to the emergency generator system.

5. That, as between Providence and Charles H. McCauley Associates, Inc. (McCauley), McCauley is liable to Providence for damages arising from delays caused by McCauley in the ultimate completion of the project. Such delays were for 29½ days in regard to the patient bed light fixtures and 80½ days in regard to the emergency generator system, for a total of 110 days of delay. Damages for said delays should be awarded at the rate of $250.00 per day for a total of $27,500.00.

Therefore, it is hereby ordered, adjudged and decreed by the Court that judgments in the following amount and for and against the following parties are hereby entered, to wit:

1. In favor of Manhattan Construction Company of Texas and against Providence Hospital in the amount of fifty-eight thousand two hundred one dollars and five cents ($58,201.05);

2. In favor of Manhattan Construction Company of Texas and against E. C. Ernst, Inc., in the amount of one hundred two thousand five hundred ninety-six dollars and eighty-nine cents ($102,596.89);

3. In favor of E. C. Ernst, Inc. and against Fairbanks-Morse, Inc., in the amount of one hundred one thousand seven hundred fifty-one dollars and twelve cents ($101,751.12);

4. In favor of Manhattan Construction Company of Texas and against Fairbanks-Morse, Inc. in the amount of twenty thousand dollars ($20,000.00);

5. In favor of Providence Hospital and against Charles H. McCauley Associates, Inc., in the amount of twenty-seven thousand five hundred dollars ($27,500.00).

It is further ordered and adjudged that each party bear its own costs of court.